[No. A011807. First Dist., Div. Four. Apr. 17, 1987.]

MONTEREY SAND COMPANY, INC., et al., Plaintiffs and
Respondents, v.
CALIFORNIA COASTAL COMMISSION et al., Defendants and
Appellants.

170

**COUNSEL**

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, Richard C. Jacobs and Joseph Barbieri, Deputy Attorneys General, for Defendants and Appellants.

Thomas H. Jamison and Hoge, Fenton, Jones & Appel for Plaintiffs and Respondents.

**OPINION**

SABRAW, J.—In this matter we hold that petitioner's extraction of sand from offshore surf zone areas of Monterey Bay was and is exempt from the coastal development permit requirements of the 1976 Coastal Act because it was authorized pursuant to a 1968 mineral lease granted by the California State Lands Commission.

The California Coastal Commission (Coastal Commission) appeals from a judgment compelling it to annul administrative decisions in which it was determined that respondents Monterey Sand Company and Monterey Sand Company, Inc. (hereinafter collectively Monterey Sand) were not exempt from the permit requirements of the coastal act, which judgment has the effect of allowing Monterey Sand to continue its sand mining operations without obtaining coastal development permits. We conclude that the sand extraction activities in question were "developments" as defined in the 1972 and 1976 Coastal Acts. However, we also conclude that Monterey Sand acquired the vested right to continue its activities exempt from regulation under those acts. Accordingly, we affirm.

## I. FACTS AND PROCEDURE

Monterey Sand began sand extraction operations at Sand City on the coast of Monterey Bay in 1945. Since 1950, it has also extracted sand at a site in nearby Marina. Until 1968, it conducted its mining operations under a claim of ownership to the offshore area from which the sand was extracted. In simplified terms, drag lines with large buckets extend from the shore into the surf zone and are used to scoop sand from the sea floor. The buckets then deposit the collected sand on conveyor belts which carry the sand for processing and packaging. The sand obtained from the two Monterey Bay sites is highly valued due to its particular characteristics and its suitability for a variety of industrial uses.

In 1965, the State Lands Commission asserted that the offshore areas in question belonged to the state and filed an action against Monterey Sand to establish such title. This action was resolved in a 1968 settlement wherein Monterey Sand acknowledged the state's claim of title pursuant to a boundary line agreement. The State Lands Commission, in turn, executed a mineral lease authorizing Monterey Sand to continue its sand extraction activities from the Marina and Sand City sites. The lease had a term of 20 years and granted Monterey Sand the right to renew the lease for two successive 10-year periods. Of particular relevance to the present dispute are provisions in the lease specifying that it is subject to "such reasonable rules and regulations as may hereafter be promulgated by any agency of the State of California having jurisdiction therein" and that extension of the lease is conditioned upon compliance with "such reasonable terms and conditions as the State . . . might impose."

In 1971, the voters of California passed Proposition 20, a statewide initiative designed to create a long-term plan for the protection and use of California's coastal resources. The initiative adopted the 1972 Coastal Zone Conservation Act (the 1972 Coastal Act) and created the California Coastal

Zone Conservation Commission. (Former Pub. Resources Code, § 27000 et seq.)

After execution of the 1968 mineral lease, Monterey Sand continued to extract sand from the state's property. Between July 1, 1968, and February 1, 1973, Monterey Sand conducted substantial work, made substantial expenditures and incurred substantial obligations in good faith reliance on the mineral lease with the state. As of July 1, 1968, Monterey Sand had obtained all applicable and necessary state and local government approvals for its extraction activities. However, at the time Monterey Sand negotiated the mineral lease with the State Lands Commission, it did not have a permit for the mining from the United States Army Corps of Engineers which was required pursuant to the Rivers and Harbors Act of 1899 (33 U.S.C. § 401 et seq.).

In July 1974, the Corps of Engineers notified Monterey Sand that a federal permit was and had been a prerequisite to its sand extraction activities. It served Monterey Sand with a cease and desist order. Shortly thereafter, in August 1974, the Corps of Engineers rescinded the cease and desist order and advised Monterey Sand to apply for a federal permit. Although the correspondence from the Corps of Engineers expressly stated that the corps did not authorize continued operations, it advised that the corps would not take legal action against Monterey Sand if the extraction operations continued pending action on the federal permit application. Monterey Sand thereafter continued its sand extraction activities. The Corps of Engineers also informed Monterey Sand that in order to obtain the federal permit, it was required to show evidence of authorization for the extraction operations under the 1972 Coastal Act.

Monterey Sand then applied to the Corps of Engineers for a federal permit. It also submitted applications for coastal development permits to the Central Coast Regional Commission (the Regional Commission), expressly stating that it did not believe permits from the Regional Commission were required in order to continue the sand extraction operations.

By its own terms, the 1972 Coastal Act was repealed on January 1, 1977. Consistent with the 1972 Coastal Act and in anticipation of the 1977 repeal date, in 1976 the Legislature enacted the California Coastal Act of 1976 (the 1976 Coastal Act). (Pub. Resources Code, § 30000 et seq.) In general, the 1976 Coastal Act continued the purposes and intent of the 1972 Coastal Act, providing for further study, planning and orderly development of California's coastal regions.

Monterey Sand's initial permit applications were returned to it by the Regional Commission after February 1, 1977, with a letter stating that they

did not constitute permit applications under the 1972 Coastal Act. In March 1977, shortly after the effective date of the 1976 Coastal Act, Monterey Sand applied to the Regional Commission for an exemption from the permit requirements pursuant to Public Resources Code section 30608. The application was based on the assertion that Monterey Sand had acquired vested rights to continue its operations as a result of substantial work and expenditures performed in reliance on the 1968 mineral lease. The Regional Commission denied the claim of exemption, finding that Monterey Sand's failure to obtain the required federal permit from the Army Corps of Engineers before the effective date of the 1972 Coastal Act rendered all of Monterey Sand's previous operations unlawful and defeated the assertion of vested rights.

Monterey Sand appealed the Regional Commission decision regarding its claim of exemption to the Coastal Commission. The Coastal Commission found that no substantial issue was presented and dismissed the appeal.

Continuing its efforts to obtain a ruling that it was exempt from the 1976 Coastal Act permit requirements, Monterey Sand then filed a petition for writ of mandate in the superior court. It initially named the Regional Commission as the sole respondent but later amended the petition to add the Coastal Commission as an additional respondent. The trial court thereafter issued an alternative writ of mandate.

At some point, the mandate action was stayed pending resolution of Monterey Sand's application for coastal development permits under the 1976 Coastal Act. The Regional Commission later granted conditional development permits to Monterey Sand which allowed continuation of its sand extraction activities.

The trial court was advised that the development permits had been granted and the mandate proceeding continued. After hearing, the trial court found that Monterey Sand's pending application to the Army Corps of Engineers constituted an application for an after-the-fact permit and that it was likely such a permit would be granted. Accordingly, the court concluded that Monterey Sand had obtained a vested right to continue its sand extraction operations for the remainder of its mineral lease with the state.

The trial court also found that the sand resource at each of the two sand extraction sites had been allocated to Monterey Sand by the state for the entire term of the mineral lease. In light of this finding, the court determined that Monterey Sand's extraction operations constituted a "continued use of a past allocation" and, therefore, did not require coastal development

permits because they did not constitute "developments" as defined in the 1972 and 1976 Coastal Acts.

Based on its alternative grounds of decision, the trial court entered judgment granting the petition for a writ of mandate and directing the Coastal and Regional Commissions to annul their administrative decisions denying Monterey Sand's claim of exemption from the 1972 and 1976 Coastal Acts for the period of the mineral lease and to take no further action against Monterey Sand with respect to that subject matter. The Regional Commission filed a timely notice of appeal.[1]

During the pendency of this appeal, Monterey Sand was issued an after-the-fact permit by the Army Corps of Engineers and it now relies heavily on that permit to support the judgment. We granted Monterey Sand's motion to take judicial notice of the permit.

## II. ANALYSIS

The Coastal Commission contends ▮ that the sand extraction activities constituted "developments" within the meaning of Public Resources Code section 30608,[2] thereby providing jurisdiction under the 1976 Coastal Act, and (2) that Monterey Sand did not acquire a vested right to continue its sand extraction activities exempt from the permit requirements of the 1976 Coastal Act because it did not obtain a necessary federal permit from the Army Corps of Engineers until after judgment in this case was entered, a date long after the two coastal acts took effect.

Monterey Sand responds that its activities were not and are not subject to the coastal development permit requirement because execution of the 1968 mineral lease by the state constituted "an allocation of coastal resources" prior to the enactment of both the 1972 and the 1976 Coastal Acts. In its view, the sand extraction operations after 1968 were a continuing use of that past allocation and such continued use of a past allocation was not intended to be regulated by either of the acts.[3]

---

[1]Pursuant to Public Resources Code section 30300, the Regional Commission ceased its existence on June 30, 1981. The Coastal Commission then succeeded to the Regional Commission's legal interest in the litigation. (Pub. Resources Code, § 30305.)

[2]Unless otherwise indicated, all statutory references are to the Public Resources Code.

[3]The "continuing use of a past allocation of coastal resources" theory asserted by Monterey Sand, and relied upon by the trial court, finds its genesis in an opinion issued by the Attorney General shortly after the effective date of the 1972 Coastal Act. (56 Ops.Cal.Atty.Gen. 85 (1973).) Among other things, the Attorney General was requested by the State Lands Commission to provide an opinion on the issue of whether a coastal development permit would be required for continued oil development and operations in the Long Beach tidelands through existing wells and facilities after February 1, 1973. The Attorney General concluded that a

■ The 1976 Coastal Act requires, inter alia, that any person wishing to undertake any "development" in the coastal zone must first obtain a coastal development permit. (§ 30600, subd. (a).) The definition of "development" is contained in section 30106 which provides, in relevant part, that "development" means "on land, in or under water . . . removing, dredging, mining, or extraction of any materials . . . ." Needless to say, the sand extraction operations of Monterey Sand fall within the literal definition of "development" which would require coastal development permits.[4]

■ Thus the central issue before us is: Did Monterey Sand acquire vested rights to continue its operations without a coastal development permit by virtue of its 1968 lease and its substantial action in reliance thereon, notwithstanding the fact that it did not obtain a federal permit from the Army Corps of Engineers until after the 1972 and 1976 Coastal Acts took effect? We conclude that it did.

■ Both the 1972 and 1976 Coastal Acts provided that a person who had acquired vested rights to undertake development within a permit area was exempted from the need to obtain a coastal development permit. (§ 30608; former § 27404.) Therefore, an activity which was already underway when either of the two acts became effective was exempt. There was, of course, the requirement that the activity be within the scope of the preexisting authorization for use of the coastal resource in question. (Cf. *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 798-799 [132 Cal.Rptr. 386, 553 P.2d 546].)

The issue of whether vested rights have arisen has been a subject of frequent dispute since the adoption of the 1972 Coastal Act. In *Patterson* v. *Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 844 [130 Cal.Rptr. 169], the court succinctly summarized the doctrine: "Where an

---

coastal development permit was required for any activity in the permit area which clearly constituted "development" as defined by former section 27103 (containing language similar to that now in § 30106). (*Id.*, at p. 89.) In interpreting whether the activity in question fell within the statutory definition of "development," and thus whether a permit was required the opinion concluded consideration should be given to whether the activity (1) would require the development of new or additional coastal zone resources or (2) would intensify or substantially change the existing use of such resources. (*Ibid.*) Further, the observation was made that the permit system authorized by the act did not "in any sense prohibit the continued present management or use of existing structures or facilities" and was "not designed to stop present use or to allow present use to deteriorate during the next four years." (*Ibid.*) Also, a reference to the "grandfather clause" in the 1972 Coastal Act (protecting those who had acquired vested rights; *id.*, at p. 88) made it clear that the underlying prerequisite to continued use of existing structures and facilities was that they already met vested rights requirements.

[4]The 1972 Coastal Act contained substantially the same provisions. (See former §§ 27103 and 27400 et seq.)

owner of property, in good faith reliance upon a governmental representation that construction is fully approved, has suffered substantial detriment by proceeding with development, the government is estopped from prohibiting the project by a subsequent change in law."

Monterey Sand acknowledges that it did not obtain the federal permit for its operations until it was granted during the pendency of this appeal. However, Monterey Sand argues that the state cannot raise the lack of the federal permit as a bar to the creation of vested rights because all necessary authorizations *from the State* were acquired by virtue of the 1968 mineral lease *before* the 1972 Coastal Act became effective.

In resolving this issue, it is important to reiterate that the grant of the 1968 mineral lease to Monterey Sand was the result of a litigation settlement. Monterey Sand gave up its claim of right and title to the subject property in exchange for a grant from the State of California to Monterey Sand of the right to continue its existing sand extraction operations for a total period of 40 years. Moreover, even though there is evidence that the state was aware that a federal extraction permit was required, nothing in the lease conditioned the right to continue extraction operations on acquisition of a federal permit.

Neither our research nor the briefs of the parties have disclosed any other vested rights decision similar to the unique facts of this case. Although many claims of vested rights have been decided under the two coastal acts, the policy considerations which determined the outcome of those vested rights decisions have little relevance to our case where one party in settlement of a lawsuit has given up a substantial claim of absolute ownership to real property in exchange for a longterm lease allowing mineral extraction from the subject property during the following 40 years.

Here, the promise in question was given by the state agency responsible for protection of the state's interest in public lands. The fortuitous and unique happenstance of a federal agency deciding six years after the lease was granted (and over thirty years after extraction began) that a federal permit was required cannot be used as a basis for imposing Coastal Commission jurisdiction under the 1976 Coastal Act. That is particularly true where the challenged party takes immediate steps to obtain the federal permit and then successfully acquires an after-the-fact permit which has the effect of legitimizing all past activities.

The foundation of the vested rights doctrine is estoppel which protects a party that detrimentally relies on the promises of government. We find it difficult to envision a stronger case for the application of estoppel

concepts than this one. A recent decision of our Supreme Court, *Halaco Engineering Co.* v. *South Central Coast Regional Com.* (1986) 42 Cal.3d 52 [227 Cal.Rptr. 667, 720 P.2d 15], is instructive. In that case, Halaco claimed that it had acquired vested rights to continue operation of various aspects of its scrap metal recycling plant and, therefore, was exempt from the permit requirements of the coastal act. The regional commission rejected Halaco's exemption assertion ruling that Halaco's failure to obtain certain special use permits from the City of Oxnard defeated the vested rights claim.

Halaco successfully petitioned the superior court for a writ of mandate which, in effect, reversed the commission's decision. On appeal, the Supreme Court affirmed. It held that, because the City of Oxnard had previously interpreted its own ordinances as requiring no additional permits, the commission could not defeat the vested rights claim on the theory that additional permits from the City of Oxnard had been required. (*Id.,* 42 Cal.3d at p. 76.) In essence, the court's decision was based on the principle that the City of Oxnard, and thus, the regional commission were estopped from requiring Halaco to obtain the additional permits.

In this case, there was evidence that, at the time the state negotiated the 1968 settlement and lease, the state was aware that a permit from the Army Corps of Engineers might be required. Nevertheless, the state did not require Monterey Sand to obtain such a permit and allowed it to continue with its sand extraction activities. Then, years later the regional commission relied upon the failure to obtain this additional permit as a basis for denying Monterey Sand's exemption claim. In these circumstances, we have little difficulty in concluding that the state's acquiescence in Monterey Sand's continued extraction activities with knowledge of the possible federal permit requirement estops the state from later relying on the lack of such a permit to assert coastal act permit jurisdiction over Monterey Sand. (2c) We hold, therefore, that Monterey Sand's acquisition of an after-the-fact permit in the circumstances of this case did not defeat its assertion of a vested right to continue its existing sand extraction activities free from jurisdiction under the two coastal acts.

■ We next consider the effect of the provision in the renewal clause of the mineral lease which conditioned extension of the lease on "such reasonable terms and conditions as the State . . . might impose." (*Ante,* at p. 172.) The Coastal Commission contends that, even if Monterey Sand acquired the vested right to continue its operations during the initial 20-year term of the lease, that same right need not apply to the two 10-year option periods.

None of the authorities cited by the Coastal Commission persuade us that any different analysis should apply to Monterey Sand's rights during the two

10-year extension periods of the lease. The right to continue the sand extraction operation for a total period of *40 years* was the quid pro quo for Monterey Sand's relinquishment of its claim of title to the land in question. We will not modify that bargained-for consideration halfway through the 40-year term of the agreement.

In sum, although we conclude that the sand extraction operations in question constitute "development" under both of the coastal acts, we hold that the initial lack of the federal permit for the operation did not defeat the claim of vested rights. We also hold that Monterey Sand's substantial reliance on the 1968 mineral lease from the State Lands Commission gave rise to the vested right to continue the then existing sand extraction operations free from the coastal act permit process.[5]

The judgment is affirmed.

Anderson, P. J., and Channell, J., concurred.

A petition for a rehearing was denied May 18, 1987, and the opinion was modified to read as printed above. The petition of appellant California Coastal Commission for review by the Supreme Court was denied July 1, 1987.

---

[5]Appellant has also argued that the mineral lease could not form the basis of vested rights because the State of California cannot contract away the right to later exercise its police power. This theory was never presented to the trial court and it is too late to raise it now. (E.g. *Rickel v. Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 655, 656 [192 Cal.Rptr. 732]; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 316-321, pp. 327-332.)