[No. B035833. Second Dist., Div. Seven. June 5, 1989.]

T. M. SMITH, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

COUNSEL

Joshua Kaplan for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, Charles J. Moore, Deputy County Counsel, Hill, Farrer & Burrill, Darlene Fischer Phillips and Dean E. Dennis for Defendants and Respondents.

OPINION

WOODS (Fred), J.—

## I.

### PRELIMINARY STATEMENT

This appeal involves the denial of a conditional use permit (hereafter CUP) to operate an adult cabaret, an establishment which offers nude or semi-nude entertainment. The court below, the Honorable Miriam A. Vogel judge presiding, denied the petition of appellant T.M. Smith, doing business as The Shangri-la (hereafter Smith) for a writ of mandate to set aside the Los Angeles County Board of Supervisors' (hereafter Board) denial of the

CUP, finding, among other things, that the Board's action was based upon substantial evidence. We affirm.

## II.

### ISSUES PRESENTED ON APPEAL

I. Did the court below properly apply the substantial evidence test?

II. Did the Board have authority to affirm the commission's decision without holding a public hearing?

III. Were the commission and the Board required to consider the interests of neighboring property owners both within and outside the county boundaries?

IV. Was the determination that Smith did not substantiate the findings for a conditional use permit supported by substantial evidence?

## III.

### SYNOPSIS OF FACTS AND PROCEEDINGS BELOW

A. *Proceedings Before the Regional Planning Commission*

The record reflects that the commission, after conducting a field trip to the site of the Shangri-la, located at 17523 East Arrow Highway, Azusa, held a hearing on November 18, 1987, at which it heard testimony from a resident of an adjacent mobilehome park and from a representative of the City of Azusa. After considering the testimony, 11 letters, and a petition from 67 residents of the mobilehome park, the commission voted unanimously to follow the staff recommendation and deny the CUP for the Shangri-la, an adult cabaret offering nude entertainment.

1. *Testimony by and on behalf of Smith*

Joshua Kaplan, counsel for Smith, described the physical setting of the Shangri-la, noting that there was a six-foot chain link fence as well as a vacant parcel and a six-foot block wall separating the establishment from a trailer park on the north. Mr. Kaplan further observed that a residential zone to the east was separated from the site by a parking lot, an automobile repair building, a storage yard, a six-foot chain link fence and a flood control channel. Finally, he argued that the route of travel would not take

residential occupants across the subject property when traversing the area to their destinations.

Mr. Kaplan also addressed the matter of the exterior appearance of the building. He conceded that it was a "problem area" but stated that Smith had voluntarily agreed to improve the appearance with "immediate" re-painting of the area and landscaping. He noted that "there should be more lighting added to the parking area" and cited Smith's agreement to desig-nate employees as security staff, arrange daily trash pick up, and "mitigate any impact of signage."

Mr. Kaplan also responded to questions from individual commissioners, including questions about the serving of alcohol, code violations, signage, and trash pickup. As to the code violations, Mr. Kaplan argued that Smith was merely a lessee of one building, and problems concerning other portions of the property "should be addressed to the owner of that parcel."

Following testimony from two other witnesses, Mr. Kaplan responded to certain issues which had been raised. He insisted that Smith had no owner-ship or control over an automobile parts building to the east where "they do automotive repair" and contended that "[t]he owner of this property and his lessee at the auto parts building are obviously creating a problem with the repair and the garbage, *but that's not us.*"

Mr. Kaplan's comments are directly at odds with earlier statements made by his client in a letter to the regional planning department on July 9, 1987, several months prior to the hearing. That letter states: "The auto repair business located on the site has been discontinued. The building housing the use is being vacated and will probably be torn down. The operator of the business is having autos and other materials removed from the premises so that building and yard will be vacant within one or two weeks."

Counsel also suggested that the beer bottles which Commissioner Clark had observed on the property "probably come from that auto parts place," and that as to any noise created, the Shangri-la was not responsible since it did not "go all night."

### 2. *Testimony of other interested persons*

#### (a) *Dan Watress*:

Mr. Watress, a senior planner for the City of Azusa, stated the city's view that the continuation of the adult entertainment business at this site would negatively affect the present and potential future land uses in the City of

Azusa. He referred to the correspondence from the City of Azusa which was in the package received by the commissioners.

(b) *Robert Keene*:

Mr. Keene, a resident of the mobilehome park to the north of the Shangri-la, spoke on behalf of the mobilehome residents, stating that he had observed its operations for the past seven years. He noted that the fence referred to by counsel had only been in place for about three weeks, that beer bottles definitely come from the "nudie place" and are thrown over the fence, that he had watched fights and the passing of dope, and that he had heard language which "makes me blush." Moreover, until about three weeks prior to the hearing, there was garbage right at the fence which he described ("and I wouldn't exaggerate") as being a foot deep: "You could smell it. The only time they cleaned it up was about a week and a half or two weeks ago." Mr. Keene stated that there had been times during that seven-year period that he lived there, that he "had to go out and rent a motel to get a night's sleep."

### 3. *Comments by interested persons*

The administrative record, which was admitted into evidence, includes 11 letters from interested persons opposing the granting of the CUP and a petition signed by 67 residents of Sylvan Villa Mobile Home Park.[1]

Especially noteworthy are the letters from the City of Covina and the City of Azusa. The September 1, 1987, letter from the City of Covina states that the city had spent many years attempting to improve the economic and physical condition of the area in the vicinity of Arrow Highway and Azusa Avenue, that it considered the Shangri-la to be "in conflict with community land use goals," that major property owners in the immediate area had voiced their concern that the Shangri-la was in conflict with the existing proposed family-type shopping center in the area, and that the city prohibits adult-type businesses within 500 feet of any residence, church, school, park, hospital, government building or senior center. The city notes that if the Shangri-la were within the City of Covina, it would not be permitted.

Similarly, the City of Azusa noted that if annexed to the city, the site would be an illegal, nonconforming use which would be required to cease operations in 180 days of becoming nonconforming. Moreover, the City of

---

[1] Since the copy of the administrative record submitted to us is missing several pages, some of the facts in this synopsis are based on the summary of administrative record prepared by respondents for the trial court and part of the record on appeal before us. Appellant has not disputed these facts.

Azusa will not grant a conditional use permit for an adult business if it is within 500 feet of any lot classified in any residential zone, either within or outside the city limits of Azusa. The City of Azusa objected that the Shangri-la was located 200 to 500 feet from businesses and residences within the city and would have a "direct effect" on property within the city and, moreover, was within the city's sphere of influence.

The letter from Azusa also noted that there was a 64-unit mobilehome park 200 feet north of the property, 3 apartment complexes with a total of 119 dwelling units 500 feet to the north, and a proposed senior citizen rest home which had been approved for development 700 feet to the north. Finally, the city noted that officials from the Azusa Police Department and City Code Enforcement Division had received complaints about undesirable persons and activities associated with the business carried on outside the Shangri-la in view of nearby residents.

In addition to the two letters from the immediately adjacent cities, the commission considered letters from Mrs. Ardis Mudra (the site was just around the corner from a "family neighborhood consisting of family apartments, senior mobile homes, and single-family homes"); James E. Dyson, a neighbor to the property for 12 years (there had been shots fired from the topless bar); Mr. and Mrs. W.E. Deal (considered the establishment to be a serious threat and annoyance to the whole neighborhood); Mrs. Eva Wells, resident of the mobilehome park since 1963 (complained of "music with a beat so loud we couldn't go to sleep until the place closed at 2:00 a.m." and of "men [who] come out and urinate all over the lot"); Resa Evans, president of the Santa Fe Kid Co. Preschool, three doors to the west of the site (144 preschoolers attend the facility on a daily basis); Harry Boand, Jr., owner of the location where the preschool is operated (the adult-type business would not enhance property values in the area and could cause them to decrease); John M. Cummings, president of the Board of Education of Azusa Unified School District (the school district opposed the CUP due to the "close proximity of the club to Gladstone High School" and the nature of the signs and the emphasis upon nudity created a disruption to the educational process); Mark Q. Beers, project manager of the Alexander Haagan Company and Lake Forest Shopping Center, owners of the Sears Shopping Center directly across the street from the property (they are building "a new and vital family shopping center") found the use and appearance of the Shangri-la to be "particularly unsuited to the environment we are creating."

The petition from the residents of the Sylvan Villa Mobile Home Park stated, among other things, that residents had seen prostitutes leave the business with their pimps and go into the abandoned medical building

adjoining the property; they had seen prostitutes coming out of the business and servicing their clients on the hoods of cars and against their perimeter wall at various times of the day and early evening; that Gladstone High School is less than one-quarter mile from the site and "impressionable young adults" pass it daily on their way to school; that they had to put up with noise and fights in the parking lot, and noise and lights of cars when the patrons are leaving the business; and that they had seen patrons from the business in the parking lot threatening each other with guns.

### 4. *Findings of the Regional Planning Commission*

Following their field trip to the site, the taking of testimony, and the consideration of written comments, the commissioners voted unanimously to instruct staff to prepare findings for the denial of petitioner's application. The commission reached two conclusions. First, it concluded that: "The requested use at the proposed location is not sufficiently buffered in relation to residentially zoned areas within the immediate vicinity so as not to adversely affect those areas." This conclusion is supported by two specific findings: Finding No. 7 provides that a combination of residential and commercial land uses surrounds the property; the use is within 190 feet of a 64-space mobilehome park and 400 feet of a single family residential neighborhood located to the north and northeast respectively; and that a preschool and high school are maintained 500 and 1,000 feet westerly of the site. Finding No. 8 provides that the adjacent mobilehome park is insufficiently buffered from the cabaret and its parking lot, and as a result, noise and loitering originating from the subject property have adversely affected the tenants of the mobilehome park.

Second, the commission concluded that: "The exterior appearance of the structure and subject property is inconsistent with the exterior appearance of commercial structures already constructed and under construction within the immediate neighborhood so as to cause blight, deterioration, and substantially diminish and impair property values within the neighborhood." This conclusion is supported by two specific findings: Finding No. 10 provides that the exterior appearance of the cabaret is substandard compared to the existing commercial structures in the immediate area. This is evidenced by the poor condition of the parking lot areas, lack of adequate landscaping, illegal signage, and the poor condition of the building exterior. Finding No. 11 provides that the subject use is inconsistent with the current development of a 36-acre commercial project immediately south in the City of Covina and the proposed senior citizens rest home to the north which has been approved for development by the City of Azusa.

The commission further made findings that the subject site had an extensive history of zoning code violations (finding No. 6) and that the requested

use requires students to pass the subject property on a regular basis. (Finding No. 9.)

The action of the commission was consistent with the staff recommendation to deny the CUP. The staff report noted, among other things, the ordinance requirements; the close proximity of the preschool and high school; the 64-space mobilehome park and multi- and single-family residential use which border the subject property to the north and east; and the City of Azusa's zoning approval for a 120-bed senior citizen rest home approximately 700 feet northerly of the site. The staff report also observed that the exterior of the cabaret is not up to par with commercial structures already constructed or under construction within the immediate area, as evidenced by the poor condition of the parking areas, lack of adequate landscaping, and illegal signage.

The regional planning department file also includes photographs of the subject site and surrounding properties and zoning and land use maps which reinforce the findings of the commission.

### B.  *Proceedings Before the Board of Supervisors*

On January 20, 1988, the petitioner appealed the denial of the CUP, requesting a "transcript review and de novo hearing." On January 21, 1988, the appeal was transmitted to Supervisor Peter F. Schabarum by way of a transmittal memorandum, noting that the supervisors could exercise one of four options: affirm the action of the commission; refer the matter back to the commission; require a transcript of testimony and take such action as is indicated by the evidence; or set the matter for public hearing before the board, such public hearing to be held de novo. On February 3, 1988, the board's executive officer transmitted a memorandum to the supervisors, noting that the matter had been placed on the agenda for consideration on March 3, 1988, that Supervisor Schabarum recommended that the action of the commission be affirmed, and that the appeal be denied.

At its meeting of March 3, 1988, without public hearing, the board called up the matter for consideration and voted unanimously to affirm the commission's decision and deny the conditional use permit.

### IV.

### DISCUSSION

### A.  *The Court Properly Applied the Substantial Evidence Test*

Smith contends that the court below should have exercised its independent judgment in reviewing the evidence since the matter "touches

upon fundamental and vested rights to continue a constitutionally protected business." (See *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29]; *Lowe* v. *Civil Service Com.* (1985) 164 Cal.App.3d 667 [210 Cal.Rptr. 673].) None of the cases cited by Smith support his position that he has any fundamental right, vested or otherwise, in or to a conditional use permit which is, by definition, discretionary.

■ Zoning laws regulate land uses in two basic ways: while some uses are permitted as a matter of right, other sensitive uses require discretionary administrative approval in the form of a CUP pursuant to criteria specified in the zoning ordinance. (Gov. Code, § 65901.) Such criteria are designed to evaluate whether the discretionary use is compatible with the proposed location. (*Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1183 [203 Cal.Rptr. 401].)

■ Smith has cited no authority, and we are aware of none, which applies a standard of review to a decision on a CUP for an adult entertainment business different from that applied to a CUP for any other business.

Section 22.56.090 of the Los Angeles County Code[2] (hereafter County Code) sets forth the general criteria for obtaining a CUP. As a result of the First Amendment protection given adult business establishments, the County has also adopted an ordinance directed specifically at the placement of adult uses. (County Code, § 22.56.190.)[3] This adult entertainment ordinance

---

[2] "22.56.090 Application—Grant or denial—Findings and decision at public hearing.

"A. The hearing office shall approve an application for a conditional use permit where the information submitted by the applicant and/or presented at public hearing substantiates the following findings: 1. That the proposed use will be consistent with the adopted general plan for the area. Where no general plan has been adopted, this subsection shall not apply;

"2. That the requested use at the location proposed will not: a. Adversely affect the health, peace, comfort or welfare of persons residing or working in the surrounding area, or

"b. Be materially detrimental to the use, enjoyment or valuation of property of other persons located in the vicinity of the site, or

"c. Jeopardize, endanger or otherwise constitute a menace to public health, safety or general welfare; and

"3. That the proposed site is adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping and other development features prescribed in this title, or as is otherwise required in order to integrate said use with the uses in the surrounding area; and

"4. That the proposed site is adequately served: a. By highways or streets of sufficient width and improved as necessary to carry the kind and quantity of traffic such use would generate, and

"b. By other public or private service facilities as are required.

"B. The hearing officer shall deny the application where the information submitted by the applicant and/or presented at public hearing fails to substantiate such findings to the satisfaction of the hearing officer."

[3] "22.56.190. Adult businesses—Additional findings prerequisite to permit.

has been upheld against a First Amendment challenge. (*People* v. *Nadeau* (1986) 182 Cal.App.3d Supp. 1, 9 [227 Cal.Rptr. 644].) Thus, although Smith must substantiate the findings required by both ordinances, there is no basis for arguing that the standard of review is any different for one than it is for the other.

■ The grant or denial of a CUP by the board is an administrative or quasi-judicial act. (*Essick* v. *City of Los Angeles* (1950) 34 Cal.2d 614, 623 [213 P.2d 492].) As a result, petitioner must proceed in administrative mandamus under Code of Civil Procedure section 1094.5[4] which requires the court to look to the administrative record to ascertain whether the agency has proceeded without or in excess of its jurisdiction; whether there was a fair hearing; or whether there was any prejudicial abuse of discretion. (§ 1094.5;[5] *Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 546 [99 Cal.Rptr. 745, 492 P.2d 1137].)

The court must review the record to determine whether the findings of the board support the decision, and whether the evidence in the record supports the findings, commonly referred to as the substantial evidence test. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12].) In applying this test, the court may not consider evidence outside the administrative record (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 79, fn. 6 [118 Cal.Rptr. 34, 529 P.2d 66]), must consider the entire record (*Topanga Assn. for a Scenic Community, supra,* 11 Cal.3d at p. 515), and must deny the writ if there is *any* substantial evidence in the record to support the findings

"A. In addition to the findings required pursuant to subsections A1, A3 and A4 of Section 22.56.090, the hearing officer shall approve and the commission shall approve an application for a conditional use permit for an adult business where the information submitted by the applicant and/or presented at public hearing substantiates the following findings:
1. The requested use at the proposed location will not adversely affect the use of a church, temple or other place used exclusively for religious worship, school, park, playground or similar use within a 500-foot radius; and
"2. The requested use at the proposed location is sufficiently buffered in relation to residentially zoned areas within the immediate vicinity so as not to adversely affect such areas; and
"3. The exterior appearance of structure will not be inconsistent with the external appearance of commercial structures already constructed or under construction within the immediate neighborhood so as to cause blight, deterioration, or substantially diminish or impair property values within the neighborhood."

[4] Unless otherwise noted, all statutory references are to the Code of Civil Procedure.

[5] Section 1094.5, subdivision (b) provides as follows: "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

(*Martin* v. *Alcoholic Bev. etc. Appeals Bd.* (1961) 55 Cal.2d 867, 880 [13 Cal.Rptr. 513, 362 P.2d 337]).

Substantial evidence has been defined in numerous ways. The definition adopted by the Legislature in the CEQA (California Environmental Quality Act) Guidelines characterizes substantial evidence as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code Regs., tit. 14, § 15384.)

■■■ Smith argues that the court below was not bound by the substantial evidence test but instead should have exercised its independent judgment and reweighed the evidence per the alternative procedures of section 1094.5. Although section 1094.5 permits the court to reweigh the evidence in the exercise of its independent judgment in a few situations, that is so if, but only if, the decision of the local agency substantially affects a fundamental vested right. (*Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d 28, 34.) To date, only four appellate decisions have held that a property owner had a "fundamental vested right" in a land use matter. Each case involved classic vested rights and estoppel principles. (See *Monterey Sand Co.* v. *California Coastal Com.* (1987) 191 Cal.App.3d 169, 172 [236 Cal.Rptr. 315]; *Halaco Engineering Co.* v. *South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 74, 76 [227 Cal.Rptr. 667, 720 P.2d 15]; *Anderson* v. *City of La Mesa* (1981) 118 Cal.App.3d 657, 660 [173 Cal.Rptr. 572]; *Stanson* v. *San Diego Coast Regional Com.* (1980) 101 Cal.App.3d 38, 48-50 [161 Cal.Rptr. 392].) No case has yet held, in the granting or denial of an application for variance or conditional use permit, that the decision affected a "fundamental vested right." In fact, the vast majority of cases considering an allegation of fundamental vested right requiring exercise of independent judgment have rejected it.[6] A sampling of these cases appears below in footnote 6.

Smith insists that the trial court should have weighed the economic aspects of the decision in "human terms" in order to determine if the

---

[6] See, e.g. *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065 [230 Cal.Rptr. 413] (determination whether a new environmental impact report is necessary); *Lindborg-Dahl Investors, Inc.* v. *City of Garden Grove* (1986) 179 Cal.App.3d 956 [225 Cal. Rptr 154] (denial of housing development site plan); *Paoli* v. *California Coastal Com.* (1986) 178 Cal.App.3d 544 [223 Cal.Rptr. 792] (condition to coastal development permit); *Fosselman's Inc.* v. *City of Alhambra* (1986) 178 Cal.App.3d 806 [224 Cal.Rptr. 361] (redevelopment agency finding of blight); *Greenebaum* v. *City of Los Angeles* (1984) 153 Cal.App.3d 391 [200 Cal.Rptr. 237] (tenants' alleged right to remain in building relative to decision on demolishing apartment building); *Del Mar* v. *California Coastal Com.* (1984) 152 Cal.App.3d 49 [199 Cal.Rptr. 225] (denial of a request for exemption from Coastal Act); *PMI Mortgage Ins. Co.* v. *City of Pacific Grove* (1981) 128 Cal.App.3d 724 [179 Cal.Rptr. 185] (denial of variances for parcels below minimum lot size requirements); *Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 943 [162 Cal.Rptr. 210] (denial of request to rezone property).

decision is one which "touches upon fundamental interests warranting an independent review." Yet, the record contains absolutely no facts to suggest Smith has experienced, or will experience, any economic hardship which is either fundamental or vested. Most denials of a land use application involve some economic hardship to the applicant, yet this alone provides no basis for the extraordinary application of the independent judgment test.

### B. *The Board Was Not Required to Hold a Public Hearing*

■ Smith contends that County Code section 22.60.240, subsections (B) and (D)[7] require the board to hold a public hearing. The trial court found the contention to be without merit, noting that the County Code permits the use of the procedure which was followed by the board.

County Code section 22.60.240, relied upon by Smith, must be read in conjunction with section 22.60.250. County Code section 22.60.240(B) provides that if there is an appeal or review *hearing,* it shall be a public hearing. This does not provide that the supervisors must hold a hearing whenever there is an appeal or review of a planning commission decision.

If this is not absolutely clear from the language of section 22.60.240(B) itself, it is absolutely and unequivocally clear when placed in the context of the following section of the County Code: "22.60.250—Additional procedures for appeals to the board of supervisors. Notwithstanding the foregoing procedures, upon receiving an appeal or initiating a call for review, the board of supervisors may take one of the following actions: 1. Affirm the action of the commission; or

"2. Refer the matter back to the commission for further proceedings with or without instructions; or

"3. Require a transcript of the testimony and any other evidence relevant to the decision and take such action as in its opinion is indicated by the evidence. In such case, the board of supervisors' decision need not be limited to the points appealed, and may cover all phases of the matter, including the addition or deletion of any conditions."

The foregoing code section specifically provides that whenever there is an appeal to the board, the supervisors have four options. One of those options

---

[7] County Code section 22.60.240 provides as follows: "B. Notice and Public Hearing. An appeal or review hearing shall be a public hearing if the decision being appealed or reviewed required a public hearing. Notice of public hearings shall be given in the manner required for the decision being appealed or reviewed.
"D. Hearing. At the hearing, the appellate body shall review the record of the decision and hear testimony of the appellant, the applicant, the party or body whose decision is being appealed or reviewed, and any other interested party."

is a hearing. The code provides that when the supervisors elect to hold a hearing, that hearing is de novo and must be a public hearing. The remaining three options, however, including the option of outright affirmance exercised here, do not require that a hearing be held.

C. *The Commission and the Board Were Required to Consider the Interests of Neighboring Property Owners Both Within and Outside the County*

Smith argues that the county exceeded its authority and violated the California Constitution and the United States Constitution by considering the impact of the Shangri-la on land uses in the neighboring cities of Azusa and Covina. He contends that article XI, section 7, of the California Constitution and article VI, clause 2, of the United States Constitution, known as the supremacy clause, permit the county to exercise its police power to make and enforce all law *only* within its jurisdictional limits. Even assuming the validity of this assertion, Smith's citations are wholly irrelevant. This is not a case of extraterritorial application of the county's authority. The county is not attempting to make or enforce any regulation on property located outside its jurisdiction. The only property the county is regulating in this case is located wholly within the jurisdictional boundaries of the county of Los Angeles.

In considering whether Smith's adult business should be continued, the county has considered the effects of this land use on property located outside its boundaries. There is nothing in article XI, section 7, of the California Constitution or in the supremacy clause of the United States Constitution that prohibits the county from considering these effects.

Smith also contends there is a dominant federal interest stemming from the "Doctrine of Federal Exemption/Supremacy" and the commerce clause of the United States Constitution which prohibits the county from "promoting or protecting the health or welfare of Azusa City citizens." According to Smith "the County of Los Angeles has no authority whatsoever to protect or defend citizens of a separate, sovereign jurisdiction!" This is not the law. Not only does the county have the right to consider the effects of its land uses on citizens of other jurisdictions, it has a constitutional responsibility to do so. *Associated Home Builders, etc. Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 607 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038], sets forth the applicable constitutional test: "We therefore reaffirm the established constitutional principle that a local land use ordinance falls within the authority of the police power if it is reasonably related to the public welfare. Most previous decisions applying this test, however, involved ordinances without substantial effect beyond the municipal bound-

aries. The present ordinance, in contrast, significantly affects the interests of nonresidents who are not represented in the city legislative body and cannot vote on a city initiative. *We therefore believe it desirable for the guidance of the trial court to clarify the application of the traditional police power test to an ordinance which significantly affects nonresidents of the municipality.*

"When we inquire whether an ordinance reasonably relates to the public welfare, inquiry should begin by asking *whose* [original italics] welfare must the ordinance serve. In past cases, when discussing ordinances without significant effect beyond the municipal boundaries, we have been content to assume that the ordinance need only reasonably relate to the welfare of the enacting municipality and its residents. *But municipalities are not isolated islands remote from the needs and problems of the area in which they are located*; thus an ordinance, superficially reasonable from the limited viewpoint of the municipality, may be disclosed as unreasonable when viewed from a larger perspective.

"These considerations impel us to the conclusion that the proper constitutional test is one which inquires whether the ordinance reasonably relates to the welfare of those whom it significantly affects. If its impact is limited to the city boundaries, the inquiry may be limited accordingly; if, as alleged here, the ordinance may strongly influence the supply and distribution of housing for an entire metropolitan region, judicial inquiry must consider the welfare of that region." (Italics added.)

Most public entities today are neither isolated nor wholly independent from neighboring entities and, consequently, land use decisions by one local unit affect the needs and resources of its neighbors. The county would have been remiss if it had not considered the impact on neighboring cities. The court below concluded as follows: "The county is entitled to regulate land within its boundaries when the effect of the regulation is on land outside its jurisdiction. No other result makes sense, particularly in the context of this case where the affected jurisdiction supports the county's decision."

It is not insignificant that both the City of Azusa and the City of Covina publicly opposed the continuation of the CUP for the Shangri-la, and included in their presentations, citations of their adult entertainment ordinances which would have absolutely prohibited the use. The County properly considered the effects of this land use on land uses in the jurisdictions of its neighbors as required by the California Supreme Court's decision in *Associated Home Builders, etc., Inc.*

D. *The Decisions of the Commission and the Board Are Supported by Substantial Evidence*

The provisions of the County Code governing CUP's for adult businesses, specifically section 22.56.190, establish three specific criteria *and* incorporate subsections (A)(1), (A)(3), and (A)(4) of section 22.56.090 which generally governs CUP's. Thus Smith was required to present evidence to substantiate the six findings mandated by the two code sections: 1. The requested use will not "adversely affect" the use of any place used for religious worship, school, park, playground, or similar purpose within a 500-foot radius (§ 22.56.190, subd. 1);

2. The requested use is "sufficiently buffered" with respect to residentially zoned areas so as not to "adversely affect such areas" (§ 22.56.190, subd. 2);

3. The exterior appearance of the structure will "not be inconsistent" with the exterior appearance of other commercial structures in the area, so as to cause "blight, deterioration, or substantially diminish or impair property values . . ." (§ 22.56.190, subd. 3);

4. The proposed use will be consistent with any general plan for the area (§ 22.56.090, subd. A1);

5. The proposed site is adequately sized and shaped to accommodate the development features required by the use (§ 22.56.090, subd. A3); and

■ 6. The proposed site is adequately served by highways or streets, and any other public or private facilities that may be required (§ 22.56.090, subd. A4).

It is clear from the language of the code that Smith bore the burden of presenting the evidence necessary to support the required findings. It is the party seeking a variance who has the burden of proof. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506, 521.) The commission determined that Smith did not present sufficient evidence to support the requisite findings. The board and the court concurred.

1. *There Is Substantial Evidence in the Record Demonstrating That the Proposed Use Is Not Sufficiently Buffered From Residential Areas*

Smith had the burden of establishing that his proposed business is sufficiently buffered in relation to residentially zoned areas within the immediate vicinity. He did not carry that burden, and there is substantial evi-

dence in the record to support the board's action based upon the commission's two findings which go to this issue. Finding No. 7 recites that a combination of residential and commercial land uses surrounds the subject property and that the requested use is within approximately 190 feet of a 64-space mobilehome park and 400 feet of a single-family residential neighborhood located to the north and northeast respectively. A preschool and a high school are maintained within 500 and 1,000 feet westerly of the site.

This finding is well documented by the evidence in the record. Robert Keene, testifying on behalf of the residents of the mobilehome park, spoke of noise, beer bottles thrown over the fence, fights, passing of dope in the parking lot, and garbage "a foot deep." One of the commissioners who had visited the site described the mobilehome as neat and well maintained in direct contrast to the site of the Shangri-la. The staff report notes and the maps confirm the proximity of the mobilehome park, the multi-family and single-family residences and the preschool and high school.

Both the City of Covina and City of Azusa objected to the issuance of a CUP for the Shangri-la. Covina considered the use to be "in conflict with community land use goals" and noted the proposed family-type shopping center in the area. The City of Azusa objected that the Shangri-la was located 200 to 500 feet from businesses and residences within the city, which would have a "direct effect" on property within the city. Both cities advised that their ordinances prohibit adult type businesses within 500 feet of any residences, and that the Shangri-la would not be permitted if it were within their jurisdictions.

Numerous letters from neighbors and residents in the community substantiate the conclusion that the proposed use is not sufficiently buffered from residentially zoned areas within the immediate vicinity. Mr. Dyson noted that there had been shots fired from the bar; Mrs. Eva Wells complained of "music with a beat so loud [she] couldn't sleep until the place closed at 2:00 a.m."; and residents of the Sylvan Villa Mobilehome Park stated that they had seen prostitutes coming out of the business and servicing their clients on the hoods of cars and against their perimeter wall at various times of the day and early evening; and that they had to put up with noise and fights in the parking lot and the noise and lights of cars when the patrons leave the business. The foregoing testimony and comment of residents in the area amply support finding No. 8 that the adjacent mobilehome park is insufficiently buffered from the cabaret and its parking lot, and noise and loitering originating from the subject property have adversely affected the tenants of the mobilehome park.

### 2. There Is Substantial Evidence in the Record Demonstrating That the Exterior Appearance of the Structure Is Inconsistent With That of Other Commercial Structures in the Area

The commission found, and the board affirmed the finding, that the exterior appearance of the cabaret is substandard in comparison to the existing commercial structures within the immediate area. The commissioners, after a field trip to the site, found that the poor condition of the parking lot areas, lack of adequate landscaping, illegal signage, and poor condition of the building exterior starkly contrasted with other structures in the area. This is illustrated by the regional planning department photographs which depict neighboring commercial structures such as Bob's Big Boy Restaurant, Super Shops Automotive Store, Color Tile Shop, Goodyear Tire Store, furniture store, and preschool. The staff report described the Shangri-la's appearance as not being up to par with that of commercial structures already constructed or under construction in the immediate area.

This inconsistency is further substantiated by the testimony of Smith's counsel, who conceded that the appearance of the property was a "problem area" and by the letter from Mark Beers, the project manager of Alexander Haagen Company and Lake Forest Shopping Center, owners of the Sears Shopping Center directly across the street from the property, who found the appearance of the site to be "particularly unsuited to the environment we are creating."

The commission also found that the subject use was inconsistent with the current development of a 36-acre commercial project immediately south in the City of Covina and the proposed senior citizen rest home to the north which had been approved for development by the City of Azusa. (Finding No. 11.) The letter from Beers describes building a "new and vital family shopping center." The letter from the City of Azusa notes that to the north of the Shangri-la, and a mere 700 feet from it, is the site of a proposed senior citizen rest home, which has been approved for development.

### 3. Other Relevant Findings of the Commission Are Supported by Substantial Evidence.

The commission found that a preschool and a high school are maintained 500 and 1,000 feet westerly of the site (finding No. 7) and that the location of the Shangri-la requires students to pass the subject property on a regular basis. (Finding No. 9.) The operator of the preschool, as well as its owner, opposed the Shangri-la which is within 500 feet of the preschool site. The Azusa Unified School District also opposed the issuance of the CUP because of the facility's close proximity to Gladstone High School. The peti-

tion from the mobilehome park residents also notes that Gladstone High School is less than one-quarter mile from the site and "impressionable young adults" pass it daily on their way to school.

The regional planning department staff report notes a history of code violations. The commissioners were aware of these violations at the time of the hearing and appeared to be concerned about the violations to the extent they might reflect how Smith would comply with any conditions that might be imposed in connection with a CUP.

While Smith attempts to argue that the above findings are "irrelevant" or unsubstantiated, they are both well substantiated and directly relevant to show that he did not meet his burden of presenting evidence sufficient to substantiate issuance of a CUP.

## V.

### CONCLUSION

The decision of the court below denying the peremptory writ of mandate is affirmed in its entirety. Respondents to recover costs on this appeal.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 30, 1989.