Filed 7/28/16  No Toxic Air v. Santa Clara County CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| NO TOXIC AIR, INC., | H039547 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-11-CV201900) |
| v. | |
| SANTA CLARA COUNTY et al., | |
| Defendants and Respondents; | |
| LEHIGH SOUTHWEST CEMENT COMPANY et al., | |
| Real Parties in Interest and Respondents. | |

The Permanent Quarry (Quarry) is a 3,510 acre surface mining operation producing limestone and aggregate for the manufacture of cement, and is located in an unincorporated area of Santa Clara County.  The Quarry has been in existence since 1903, and is currently owned by Lehigh Southwest Cement Company and Hanson Permanente Cement (collectively "Lehigh").

At issue in this case, is the Santa Clara County Board of Supervisors' (County) 2011 resolution finding that the Quarry's surface mining operations are a legal nonconforming use.

No Toxic Air, Inc. (No Toxic Air) is a non-profit organization that represents residents of Santa Clara County. No Toxic Air filed a petition for peremptory writ of mandate challenging the County's March 1, 2011 resolution granting Lehigh legal nonconforming use status.

The trial court denied No Toxic Air's writ petition, affirming the County's resolution. No Toxic Air appeals the denial of the petition, arguing that the trial court erred in using the substantial evidence standard to review the County's findings. In addition, No Toxic Air asserts that the County's determination that the Quarry's surface mining rights were vested, and therefore eligible for legal nonconforming use status, was not supported by the evidence in the administrative record.[1]

In a separate appeal (H040047), Lehigh challenges the trial court's grant in part of No Toxic Air's Motion to Tax Costs associated with the preparation of the administrative record in the mandate proceedings. Lehigh asserts that as the prevailing party in the mandate proceedings, it is entitled to recoup costs associated with the preparation of the administrative record, including labor costs of paralegals and attorneys to assemble the record.

---

[1] Midpeninsula Regional open Space District, City of Los Altos, Town of Los Altos Hills, Town of Portola Valley, City of Sunnyvale, Committee for Green Foothills, and Breathe California filed an application to submit briefs as amici curiae in support of No Toxic Air. Lehigh requested leave to file an objection to the application. We granted Lehigh leave to file the objection, and deferred consideration of the application with the appeal. Lehigh's objection to the application to file amicus briefs is overruled and the application is granted.

Bay Planning Coalition, San Jose Silicon Valley Chamber, Santa Clara and Sam Benito Counties Building and Construction Trades Council, Bay Area Council, Cupertino Chamber of Commerce, Silicon Valley Leadership Group, Building Industries Association of the Bay Area and California State Association of Counties filed an application to submit briefs as amici curiae in support of County that we granted.

## STATEMENT OF FACTS[2]

The Quarry is located at the end of Permanente Road, which is the continuation of Stevens Creek Road in unincorporated Santa Clara County near the western border of the City of Cupertino. Since 1903, the Quarry has been conducting a surface mining operation producing limestone and aggregate.

In 1939, The Permanente Corporation (Permanente) purchased the Quarry property, which at that time consisted of approximately 1,300 acres. In the same year, Permanente received a use permit from the County to construct and operate a cement factory next to the Quarry, using limestone produced from the Quarry. This use permit remains in effect.

From the date of the original purchase in 1939, Permanente expanded the Quarry's operations, opening new mining areas on the property, and acquiring adjacent parcels. At the time of the County's vesting determination in 2011, the Quarry had grown to 3,510 acres consisting of 19 separate parcels.

In January 1948, Santa Clara County zoning ordinances went into effect that required use permits for mining operations such as those conduced at the Quarry. By this time, the Quarry was running large scale operations on the property such as mineral extraction, overburden[3] disposal and storage, conveyor systems operations and material processing. During the period between 1948 and 2011 when the County made its vesting determination, Permanente did not seek a use permit for its Quarry operations, and the County did not enforce the zoning ordinances to require the Quarry to acquire a permit.

---

[2] No Toxic Air's request for judicial notice filed October 29, 2013 is denied. No Toxic Air's supplemental request for judicial notice filed December 30, 2013 is granted.

[3] Overburden in mining is the "material overlying a deposit of useful geological materials or bedrock." (Merriam-Webster 10th Collegiate Dict. (2001) p. 826.)

In fall of 2010, Lehigh, which had become a subsequent owner of the Quarry, applied to the County for a declaration that the mining operations at the Quarry qualified as a legal nonconforming use. In response to the application, the County conducted an investigation of the history of mining operations at the Quarry. The County held a public hearing on February 8, 2011, where it considered records supplied by County staff, and Lehigh, and heard comments from the public. At the end of the hearing, the County concluded that the mining activities at the Quarry qualified as a legal nonconforming use.

The County's decision was finalized in a resolution issued on March 1, 2011. In determining vesting of areas of the Quarry, the County used a mapping system that divided the land into 19 parcels. The County concluded that vested rights to conduct surface mining operations existed as to 13 of the 19 total parcels that make up the Quarry; the County found that there were no vested rights as to the six parcels numbered 4, 10, 13, 18 and 19. In addition, the County found that January 28, 1948 was the first date that the County could have required Permanent to secure a conditional use permit under zoning ordinances in place at that time. Finally, the County also found that Permanente Road was not a public street within the meaning of the original zoning ordinance adopted in 1937, because the road was closed to public traffic in 1935, and surface mining operations began on Quarry property before 1937.

In May 2011, No Toxic Air filed a petition for a peremptory writ of mandate pursuant to Code of Civil Procedure section 1094.5,[4] challenging the Board's March 1, 2011 Resolution. The court denied the writ, and entered judgment in favor of the County and Lehigh. On April 22, 2013, No Toxic Air filed a notice of appeal.

## DISCUSSION

No Toxic Air raises a number of arguments on appeal. First, it asserts that the trial court applied the wrong standard when reviewing the administrative proceedings.

----

[4] All further statutory references are to the Code of Civil Procedure.

Second, No Toxic Air argues that the County's findings regarding Lehigh's vested rights, and whether Pemanente Road was a public street were not supported by the evidence. Finally, No Toxic Air asserts that the County's findings were not sufficiently specific.

### *Standard of Review*

On appeal, No Toxic Air asserts that the trial should have applied its independent judgment when reviewing the administrative record, rather than the substantial evidence test. Specifically, No Toxic Air asserts that the independent judgment test is applicable, because this case involved vested rights.

Section 1094.5 applies to judicial review by administrative mandate of any final decision or order rendered by an administrative agency. A trial court's review of an adjudicatory administrative decision is subject to two possible standards of review depending upon the nature of the right involved. (§ 1094.5, subd. (c).)

If the administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence. (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 (*Strumsky*).) In such a case, the trial court must not only examine the administrative record for errors of law, but must also conduct an independent review of the entire record to determine whether the weight of the evidence supports the administrative findings. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143.) If, on the other hand, the administrative decision does not substantially affect a fundamental vested right, the trial court's review is limited to determining whether the administrative findings are supported by substantial evidence. (*Strumsky, supra,* at p. 32.)

The trial court's standard of review is determined by whether the aggrieved party has a vested right that was affected by the agency's administrative action. (*Sierra Club v. California Coastal Zone Conservative Commission* (1976) 58 Cal.App.3d 149 (*Sierra Club*).) In *Sierra Club*, the plaintiffs claimed that the California Coastal Commission

5

erred in finding that part of a development was exempt from permit requirements because the property owners had vested rights to develop the property. The plaintiffs argued that the court should have applied the independent judgment test to review the administrative action, because the case involved a vested right. The Court of Appeal disagreed; finding that only the holder of the vested right may seek independent review. The court stated: "[A] party has no standing to assert that an independent judgment review rather than a substantial evidence review is required unless it possesses a fundamental vested right on its own behalf which was involved in an administrative agency's action. (See *Northern Inyo Hosp. v. Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14, 23, fn. 9.) The Sierra Club has no fundamental vested right of its own; therefore, it cannot assert the existence of [the landowner's] fundamental vested right to obtain an independent judgment review." (*Sierra Club, supra*, 58 Cal.App.3d at pp. 155-156.)

Here, as the plaintiffs did in *Sierra Club*, No Toxic Air asserts that because a vested right is involved in this case, the trial court should have applied the independent judgment standard to review the County's decision. However, like the plaintiffs in *Sierra Club*, No Toxic Air does not possess a vested right of its own. The only vested right in this case is possessed by Lehigh, and it is to the mining rights to certain parcels within the Quarry. Under the holding of *Sierra Club*, No Toxic Air cannot assert the existence of Lehigh's vested right "to obtain independent judgment review." (*Sierra Club, supra*, 58 Cal.App.3d at p. 156.)

### *Declaration of Timothy Brand*

In an effort to establish a vested right and secure independent review of the administrative action, No Toxic Air included the declaration of Timothy Brand with its reply brief in the trial court. Timothy Brand is a homeowner whose home is affected by the operations of the Quarry. Mr. Brand stated that the Quarry's operations affected his use and enjoyment of his home because of noise and dust in the air.

6

Lehigh objected to the trial court's consideration of the declaration, because the allegations of the Quarry's impact on Mr. Brand's home were not included in No Toxic Air's petition for preemptory writ of mandate in the trial court. In addition, Mr. Brand's declaration was not before the County during the administrative proceedings, and was not part of the administrative record. Finally, No Toxic Air did not properly augment the administrative record to include the declaration under section 1094.5 subdivision (e).

The trial court did not rule on Lehigh's objection to Mr. Brand's declaration. However, the trial did apply the substantial evidence standard of review, and was not persuaded by No Toxic Air's attempts to secure independent judgment.

Mr. Brand's declaration is not a part of the administrative record, and we will not consider it on appeal. In reviewing whether the trial court acted properly in denying No Toxic Air's petition, we consider only the evidence contained in the administrative record. (*Smith v. County of Los Angeles* (1989) 211 Cal.App.3d 188, 198.)

### Substantial Evidence Test

We find that the trial court properly applied the substantial evidence test to a review of the County's decision in this case. No Toxic Air has no vested right in this case that would entitle it to independent review of the evidence.

"Under the substantial evidence test, courts do not reweigh the evidence. They determine whether there is any evidence (or any reasonable inferences which can be deduced from the evidence), whether contradicted or uncontradicted, which, when viewed in the light most favorable to an administrative order or decision or a court's judgment, will support the administrative or judicial findings of fact. Administrative and judicial findings are presumed to be supported by the record; and orders, decisions and judgments are presumed to be correct. Persons challenging them have the burden of showing that they are not supported or correct. [Citations.]" (*Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 895, fn. 11.)

7

### County's Findings of Legal Nonconforming Use

At issue in this case is the County's finding that all of the contiguous lands in the Quarry that were acquired by 1948 were committed to surface mining operations. The finding is as follows: "Kaiser conducted surface mining operations, or showed the objective intent to conduct surface mining operations on the Vested Parcels. The scale of Quarry operations, ownership of the Vested Parcels prior to the Vesting Date, actual land disturbance over a portion of the Vested Parcels, evidence of progressive expansion, exploratory activities, and mineral analysis, show objective intent to use all of the Vested Parcels for surface mining operations, in their entirety."

#### Surface Mining Operations

Surface mining in California is regulated under the Surface Mining and Reclamation Act (SMARA), which defines the activity as follows: " ' Surface mining operation' means all, or any part of, the process involved in the mining of minerals on mined lands by removing overburden and mining directly from mineral deposits, open-pit mining of minerals naturally exposed, mining by auger method, dredging and quarrying, or surface work incident to an underground mine. Surface mining operations shall include, but are not limited to: [¶] (a) In place distillation or retorting or leaching. [¶] (b) The production and disposal of mining waste. [¶] (c) Prospecting and exploratory activities." (Pub. Resources Code, § 2735.)

"Mined lands" under SMARA are defined as follows " 'Mined lands' includes the surface, subsurface, and ground water of an area in which surface mining operations will be, are being, or have been conducted, including private ways and roads appurtenant to any such area, land excavations, workings, mining waste, and areas in which structures, facilities, equipment, machines, tools, or other materials or property which result from, or are used in, surface mining operations are located." (Pub. Resources Code, § 2729.)

8

### *Legal Nonconforming Use*

"A legal nonconforming use is one that existed lawfully before a zoning restriction became effective and that is not in conformity with the ordinance when it continues thereafter. [Citations.] The use of the land, not its ownership, at the time the use becomes nonconforming determines the right to continue the use." (*Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 540, fn. 1 (*Hansen Brothers*).) This legal nonconforming use of property is sometimes referred to as a "vested right" to use the property in the nonconforming manner. (*Id.* at p. 555.) Although there is a general rule banning expansion of a nonconforming use, there is an exception to this rule for mining enterprises. (*Id.* at p. 553.) Mining is sometimes called " 'quarrying." (*Id.* at p. 544, fn. 7.) "When a mining or quarrying operation is a lawful nonconforming use, progression of the mining or quarrying activity into other areas of the property is not necessarily a prohibited expansion or change of location of the nonconforming use. When there is objective evidence of the owner's intent to expand a mining operation, and that intent existed at the time of the zoning change, the use may expand into the contemplated area." (*Id.* at p. 553.) The theory behind the mining exception to the general rule banning expansion of a nonconforming use has been explained as follows: " '[Q]uarrying constitutes the use of the land as a "diminishing asset." [Citation.] Consequently . . . quarrying, as a nonconforming use, cannot be limited to the land actually excavated at the time of the enactment of the restrictive ordinance because to do so would, in effect, deprive the landowner of his use of the property as a quarry.' [Citation.]" (*Id.* at p. 554.) The exception is thus known as the " 'diminishing asset' doctrine." (*Id.* at pp. 554, 557.)

"Intensification or expansion of the existing nonconforming use, or moving the operation to another location on the property is not permitted. [Citation.]" (*Hansen Brothers, supra,* 12 Cal.4th at p. 552.) Applying this rule to mining is problematic

9

because unlike other uses that operate within an existing structure or boundary, mining anticipates expansion into new areas of the property as the resources are excavated. (*Id.* at p. 553.) In *Hansen Brothers,* our Supreme Court considered whether "this extension is a prohibited expansion of a nonconforming use into another area of the property." (*Ibid.*)

The Supreme Court concluded the answer was no. It found the diminishing asset doctrine, "an exception to the rule banning expansion of a nonconforming use that is specific to mining enterprises," applied in California. (*Hansen Brothers, supra,* 12 Cal.4th at pp. 553, 559.) Under the diminishing asset doctrine, "[w]hen there is objective evidence of the owner's intent to expand a mining operation, and that intent existed at the time of the zoning change, the use may expand into the contemplated area." (*Id.* at p. 553.)

The diminishing asset doctrine recognizes that mining anticipates expansion into areas not previously used. " 'The very nature and use of an extractive business contemplates the continuance of such use of the entire parcel of land as a whole, without limitation or restriction to the immediate area excavated at the time the ordinance was passed. A mineral extractive operation is susceptible of use and has value only in the place where the resources are found, and once the minerals are extracted it cannot again be used for that purpose. "Quarry property is generally a one-use property. The rock must be quarried at the site where it exists, or not at all. An absolute prohibition, therefore, practically amounts to a taking of the property since it denies the owner the right to engage in the only business for which the land is fitted." [Citations.] *An entire tract is generally regarded as within the exemption of an existing nonconforming use, although the entire tract is not so used at the time of the passage or effective date of the zoning law.*' [Citation.]" (*Hansen Brothers, supra,* 12 Cal.4th at pp. 553-554, original italics.)

10

No Toxic Air agrees that the evidence in the record supports vesting for parcels 3, 6, 7, and 9. Both No Toxic Air and County agree that there were no vested rights in parcels 4, 10, 12, 13, 18, and 19. The dispute in this case relates to parcels 1, 2, 5, 8, 11, 14, 15, 16 and 17, which No Toxic Air argues should not have been found to have vested rights.

The County made its vesting determination regarding all of the parcels by considering evidence of the scale of quarry operations, the ownership of parcels, mineral analysis, exploratory activities, and road building as of 1948. The County found that as of that date, the scale of the Quarry's operations was large, as the Quarry was producing 1.5 million tons of limestone each year. The adjacent cement plant's capacity had been expanded twice between 1939 and 1948 to add new kilns. At the time, Kaiser was increasing the Quarry's output of additional products such as aggregates, paving material and rail ballast. The Quarry was increasing production to keep up with post-war development and large projects such as the Shasta Dam, as well as west coast military bases.

With regard to Kaiser's land ownership in 1948, the County found that following Kaiser's original acquisition of the Quarry in 1939, it purchased additional contiguous land in 1942 and 1943, which make up 13 parcels. All of the parcels that the County found vested were owned by Kaiser prior to the vesting date in 1948.

The County also considered mining disturbance, as well as the progressive expansion of mining operations throughout the land owned prior to 1948. A contiguous part of the Quarry exited on parcel 11, which contained roads. Parcels 14 and 15 also contained roads that connected different parts of the Quarry. Parcels 16 and 17 were used for stockpiling, and contained roads that linked different parts of the Quarry operation. The County reviewed photographs from 1939 and 1948 that showed an increase in the mining operations throughout all of the parcels owned prior to 1948.

11

In its vesting finding, the County considered whether the land owned by Kaiser prior to the vesting date in 1948 was integrated into a single operation. Parcels 1, 2 and 3, are a contiguous larger tract. Parcels 1 and 3 were a part of a Kaiser property acquisition in 1939. Parcel 2 was part of a 1942 acquisition of land that included Parcel 5. Both parcels 2 and 5 were contiguous to Kaiser's original 1939 mining tract, and all were in active use by the vesting date in 1948.

No Toxic Air asserts that the County's finding of vesting was not supported by substantial evidence. Specifically, No Toxic Air points to the fact that with regard to parcels 1, 2, 5, 11, 14 and 15, there was no evidence of actual mining activities occurring as of 1948. With regard to parcel 8, No Toxic Air argues that the only evidence of mining as of 1948 was a "few roadways in its northernmost areas." Similarly, No Toxic Air argues that parcels 9, 16 and 17 also had no "areas of actual mining excavation." No Toxic Air does concede that parcels 9, 16 and 17 contained roadways and conveyor belts that would "qualify as nonconforming mining-associated structures," but that they "were not mining *per se*." As a result, No Toxic Air argues that the diminishing assets doctrine should not apply to these parcels to allow legal nonconforming use status.

No Toxic Air's arguments are based on its separation of various activities on each of the parcels, and its position that each of the contested parcels did not contain evidence of actual mining activity. However, in applying the diminishing asset doctrine, the court in *Hansen Brothers* explained that the "overall business operation" must be considered, and it "may not be broken down into component parts and vested rights recognized for less than the entire business operation." (*Hansen Brothers, supra,* 12 Cal.4th at pp. 565-566.)

The administrative record in this case supports the County's finding that " ' "the nature of the initial nonconforming use" ' " (*Hansen,* 12 Cal.4th at p. 568) was a quarrying operation undergoing an expansion. The record supports a finding that the

12

Quarry property represented by parcels 1, 2, 3, 5, 6, 7, 8, 9, 11, 14, 15, 16 and 17 were part of Kaiser's mining operation, and were functions as a mine as of the vesting date in 1948.

***County's Finding That Pemanente Road is Not a Public Street***

No Toxic Air argues that the County's finding that Permanente Road was not a public street under the zoning ordinance that exited in 1937 was not supported by the evidence in the record. No Toxic Air asserts that Pemanente Road is public street, and as a result, the Quarry is subject to the prohibition against "[c]ommercial excavating of natural materials within a distance of one thousand (1000) feet from any public street" without a use permit.

The County's 1937 zoning ordinance defined a "public street" as: "[a] public or private thoroughfare which affords the principal means of access to abutting property . . . ." The County found that Permanente Road was not a "public street" because by 1935, Permanente Road was closed to all but Quarry traffic. The County's finding is as follows: "In or around 1935, no public access was allowed on Permanente Road. County records do not evidence any action by the Board to vacate Permanente Road, but show that at a public hearing in 1935, the County Surveyor advised the Board that a gate that had been erected across Permanente Road 'was not across a county road.' As of 1935, Permanente Road was not a 'public street' as that term was defined in the County 1937 Zoning Ordinance because the road was no longer a public thoroughfare that afforded the principal means of access to abutting property. Because surface mining operations commenced on the Quarry property prior to 1937 and because the portion of Permanente Road running through the Quarry property was not a 'public street' as of 1937, no part of the Quarry required a use permit under the County's 1937 Zoning Ordinance by virtue of its proximity to Permanente Road. (See Staff Report pp. 21-22;

13

Exhibits 4, 21 and 43; Lehigh's January 4, 2011 letter, pp. 29-31, Appendix B; Lehigh's February 2, 2011 letter, Exhibit E.)

No Toxic Air argues that Permanente Road was, in fact, a public street, and the County's finding to the contrary was not supported by the evidence. Specifically, No Toxic Air argues that because the Santa Clara Holding Company did not own every parcel that abutted the road, the road could have been the principal means of access for other properties. As such, the road would be a public road within the meaning of the 1937 zoning ordinance.

Here, despite No Toxic Air's assertions to the contrary, the record supports the County's finding that Permanente Road was not a public road within the meaning of the 1937 zoning ordinance. In finding that Permanente Road was not a public street, the County relied on a number of pieces of evidence, including minutes from a Board of Supervisor's meeting in 1935 that stated that there was no public access on the road at that time because the road was gated. In addition, the 1939 permit application submitted by Kaiser states the following: "[t]here are no streets upon the property, or in the vicinity of the proposed plant." A County survey conducted in 1947 showed that Permanente Road ended in Kaiser's property, and did not provide access to any other property.

The evidence in the administrative record supports the County's findings that Permanente Road was not a public street, and therefore, we presume that the findings are correct. (See *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1062.)

### *Adequacy of County's Findings in Approving Legal Nonconforming Use*

No Toxic Air argues that the County did not adequately identify the evidence upon which it relied in finding that portions of the Quarry were vested and entitled to legal nonconforming use status.

14

The Supreme Court has held that an agency's adjudicatory decision that is subject to judicial review under section 1094.5 must include findings in support of that decision. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 (*Topanga*).) The high court explained that because section 1094.5, subdivision (b) "defines 'abuse of discretion' to include instances in which the administrative order or decision 'is not supported by the finding, or the findings are not supported by the evidence' " (*Id.* at p. 515), "implicit in section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order. . . . By focusing . . . upon the relationships between evidence and findings and between findings and ultimate action, the Legislature sought to direct the reviewing court's attention to the analytic route the administrative agency traveled from evidence to action. In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route." (*Ibid.*) These findings, however, "do not need to be extensive or detailed." (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 516.) " ' "[W]here reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency 'in truth found those facts which as a matter of law are essential to sustain its . . . [decision].' " ' [Citation.]" (*Id*. at pp. 516-517.)

The County properly identified evidence in this case to support its finding that specific parcels in the Quarry have vested rights and are entitled to legal nonconforming use status. Each of the County's conclusions is supported by citation to specific evidence it considered, including County staff reports, information submitted by Lehigh, oral presentations at the hearing, and visual evidence including aerial photographs. The

County provided sufficient findings "to bridge the analytic gap between the raw evidence and ultimate decision" in this case. (*Topanga, supra*, 11 Cal.3d at p. 515.)

### *Conclusion*

With regard to No Toxic Air's petition for peremptory writ of mandate, we find that the trial court applied the correct substantial evidence standard when it reviewed the administrative action. In addition, the County's findings regarding Lehigh's vested rights, and whether Pemanente Road was a public street were supported by the evidence. Finally, the County's findings were sufficiently specific to support its conclusions.

### DISPOSITION

We affirm the order of the trial court denying No Toxic Air's petition for peremptory writ of mandate.

Costs are awarded to Lehigh.

16

_____

RUSHING, P.J.


WE CONCUR:




_____

PREMO, J.




_____

ELIA, J.




*No Toxic Air, Inc. v. Santa Clara County et al.*
**H039547**


17